UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Case No. 24-23022-rmb |
| Azharuddin N. Pathan and Tehsinbanu A. Pathan, | Chapter 7 |
| Debtors. | |

| | |
|---|---|
| Waseem Ahmed, | |
| Plaintiff, | Adversary No. 24-02116-rmb |
| v. | |
| Azharuddin N. Pathan, | |
| Defendant. | |

## POST-TRIAL DECISION

Debtor Azharuddin Pathan borrowed $100,000 from Waseem Ahmed for use in his gas station businesses. Ahmed seeks to have the debt owed to him declared nondischargeable under 11 U.S.C. § 523(a)(2)(A). Having reviewed the evidence presented at trial, the Court concludes that Ahmed met his burden of proof and he is entitled to a declaration of nondischargeability as to $47,112.57 of the debt.

### FACTUAL BACKGROUND

Four witnesses testified at the trial in this matter: plaintiff Waseem Ahmed, Angela Meyer (controller of Holiday Wholesale), Joe Lambert (owner of a business which provided gaming machines to Pathan's gas station convenience stores), and debtor-defendant Azharuddin Pathan. The Court also admitted 21 exhibits into

evidence.  The Court finds the following facts based on the record, the testimony, and the admitted exhibits.

### 1.  Pathan's Business

Pathan has worked in gas stations since 2015 and opened his own gas station in 2020 in Stevens Point, Wisconsin.  Ultimately, Pathan controlled several gas stations, each with an accompanying convenience store typical of those found in most gas stations in Wisconsin.  At least three were operating businesses at some point; it is unclear whether the other two were ever open for business.

Some of the gas stations were leased.  For those, Pathan received the profit from the convenience store, while the landlord received the profit from the gas pumps.

Pathan does not have any formal business training.  He testified that he took no steps to keep his business and personal finances separate because he did not know he needed to separate them.  He and his wife regularly put business expenses on their personal credit cards.  He also had trouble documenting and paying his taxes.  At one point, the Wisconsin Department of Revenue closed one of the stores due to non-payment of taxes.  By 2022, Pathan's stores (and his personal finances) were in dire financial trouble.

### 2.  Loan from Ahmed to Pathan

Ahmed met Pathan in mid-2022 when he was a customer at one of Pathan's gas stations in Wisconsin Rapids.  The two bonded over a shared cultural heritage, and Pathan offered Ahmed a job working at one of the gas stations.  The two

became close, and referred to each other as "bhai," a Hindi word akin to "brother" used as an affectionate reference.

Ahmed soon was working at two of the locations. Ahmed's duties were that of a general gas station attendant—assisting customers, tending the register, managing inventory, and preparing sales reports for his shifts. Ahmed soon noticed that the convenience stores did not have the full assortment of products one would expect to find in such a store connected to a gas station. Customers frequently asked him about missing items, and he relayed those queries to Pathan. In response, Pathan told Ahmed he should tell customers that the store would be stocked in the next week. According to Ahmed, this sort of exchange happened several times, but Pathan never purchased products to stock the shelves. Pathan told Ahmed that what he really needed was an infusion of cash to stock the shelves, and those sales would help turn the business around.

In early January 2023, Ahmed told Pathan about a lawsuit he had filed against Walmart and that he expected to receive a settlement from the claim. Pathan then requested that Ahmed loan him $50,000. Ahmed put him off at first because had not yet received the settlement. In the following days and weeks, Pathan repeatedly inquired whether Ahmed had received his settlement check yet.

In late January 2023, Ahmed told Pathan that he had settled his claim against Walmart and would be receiving money from the settlement soon. Upon hearing this, Pathan asked Ahmed for a loan of $100,000. Ahmed said he agreed to the loan based on the parties' relationship and because Pathan's many statements

3

and suggestions that the cash would allow Pathan to stock the convenience store shelves and otherwise drive business and profits. Pathan told Ahmed at times that he had a dream to open 500 or more gas stations, a dream he could work on fulfilling if only he could fill the stores with inventory. The parties' conversations left Ahmed with the firm impression that Pathan would use the funds solely for the businesses. Pathan never said anything that would lead Ahmed to believe that the loaned funds would be used for any other purpose or that Pathan would use the funds for personal expenses. Ahmed believed that by giving money to Pathan, it would solve a lot of the issues with the business; based on Pathan's comments, he was under the impression that the money would enable Pathan to buy groceries for the stores and then pay Ahmed back with the sale proceeds. Pathan testified that Ahmed was not concerned with how Pathan would spend the money, but the Court finds that testimony was not credible.

The parties agreed to structure the loan with two promissory notes (the "Notes"). (Pl. Exs. 7 & 8, Dkt. No. 33.) The principal amount of each Note was $50,000. The first Note had a maturity date of June 30, 2023, and the second had a maturity date of January 31, 2025. The Notes are otherwise identical.

The Notes are titled "Wisconsin Promissory Note (Secured)." Pathan found the forms for the promissory notes on the internet. Ahmed asked that the notes be "secured" to provide better assurance that the loan would be repaid. Ahmed believed that a secured loan was less risky than an unsecured loan and that a secured loan could not be discharged in bankruptcy, but he otherwise did not

understand what it meant for a loan to be secured.  Pathan similarly had little understanding of the term "secured" in relation to a loan; he simply chose forms he found online that included the word "secured."  The Notes do not identify any property offered as security for the loans, and the parties did not discuss Ahmed receiving a security interest in any particular property.  Neither party had knowledge or understanding regarding many of the terms of the Notes, though they both understood the loan amount and maturity date.

### 3.  Disposition of Loan Proceeds

Pathan deposited the $100,000 from Ahmed in his personal bank account on January 26, 2023.  (Pl. Ex. 9, Dkt. No. 33.)  The money was gone less than three weeks later.  The following transactions occurred in Pathan's account after the funds were deposited:

| Date | Description | Amount | Balance |
|---|---|---|---|
| 1/24/2023 | Beginning Balance | | -$1,793.80 |
| 1/26/2023 | Loan Proceeds Deposit | $100,000.00 | $98,206.20 |
| 1/27/2023 | Wells Fargo Card Payment | -$1,000.00 | $97,206.20 |
| 1/27/2023 | Online Payment to "Ala 3308" | -$734.34 | $96,471.86 |
| 1/27/2023 | Payment to Chase Card 4680 | -$428.52 | $96,043.34 |
| **1/27/2023** | **Cash Withdrawal** | **-$42,000.00** | **$54,043.34** |
| 1/27/2023 | Zelle Payment to Waqas Yaseen | -$2,000.00 | $52,043.34 |
| 1/27/2023 | Zelle Payment to Waqas Yasin | -$2,000.00 | $50,043.34 |
| 1/27/2023 | Xoom Payment | -$2,280.21 | $47,763.13 |
| 1/27/2023 | Xoom Payment | -$189.85 | $47,573.18 |
| 1/30/2023 | Apple Card Payment | -$1,250.00 | $46,323.18 |
| 1/30/2023 | Caf Direct Check Retry Pymt | -$724.34 | $45,598.84 |
| 1/30/2023 | Payment to Chase Card 8086 | -$1,250.00 | $44,348.84 |
| 1/30/2023 | Doordash | -$92.63 | $44,256.21 |
| 1/30/2023 | Payment to Chase Card 4680 | -$9.80 | $44,246.41 |
| 1/30/2023 | Discover E-Payment 6488 | -$1,250.00 | $42,996.41 |
| 1/30/2023 | Huntington Bank Payment | -$1,057.18 | $41,939.23 |
| 1/30/2023 | Credit One Bank Payment | -$1,000.00 | $40,939.23 |
| 1/30/2023 | Best Buy Card Payment | -$1,000.00 | $39,993.23 |

| Date | Description | Amount | Balance |
|---|---|---|---|
| 1/30/2023 | Citi Card Payment | -$747.87 | $39,191.36 |
| 1/30/2023 | Spectrum | -$383.36 | $38,808.00 |
| 1/30/2023 | Discover E-Payment 5024 | -$1,250.00 | $37,558.00 |
| **1/30/2023** | **Costco** | **-$2,317.49** | **$35,240.51** |
| **1/30/2023** | **Costco** | **-$23.83** | **$35,216.68** |
| 1/30/2023 | Cash Withdrawal | -$10,000.00 | $25,216.68 |
| **1/30/2023** | **Zelle Payment to Gourav Patel** | **-$1,600.00** | **$23,616.68** |
| 1/30/2023 | Xoom Payment | -$579.99 | $23,036.69 |
| 1/31/2023 | Wisconsin Public Payment | -$705.09 | $22,331.60 |
| **1/31/2023** | **Wire Transfer Lincoln Fuel Inc.** | **-$5,000.00** | **$17,331.60** |
| **1/31/2023** | **Zelle Payment to Stainley Shell** | **-$1,300.00** | **$16,031.60** |
| 1/31/2023 | Capital One Payment | -$1,997.50 | $14,034.10 |
| **1/31/2023** | **Online Domestic Wire Fee** | **-$25.00** | **$14,009.10** |
| 2/01/2023 | Stripe  Lyft | $429.15 | $14,438.25 |
| 2/01/2023 | American Express Retry Payment | -$1,000.00 | $13,438.25 |
| 2/01/2023 | Credit One Bank Payment | -$720.78 | $12,717.47 |
| **2/02/2023** | **Wire Transfer Paycycle, Inc.** | **-$1,586.11** | **$11,130.66** |
| **2/02/2023** | **Domestic Wire Fee** | **-$35.00** | **$11,095.66** |
| 2/06/2023 | Fresh Market | -$217.58 | $10,878.08 |
| 2/06/2023 | Nyab Mart | -$699.82 | $10,178.26 |
| 2/06/2023 | Sabri Nihari Restaurant | -$94.10 | $10,084.16 |
| **2/06/2023** | **Zelle Payment to Stainley Shell** | **-$1,000.00** | **$9,084.16** |
| 2/06/2023 | Spectrum | -$50.92 | $9,033.24 |
| 2/06/2023 | Xoom Payment | -$382.99 | $8,650.25 |
| 2/07/2023 | Zelle Payment from Babar Parvez | $260.00 | $8,910.25 |
| 2/07/2023 | Elastum-Simplex (cryptocurrency) | -$150.00 | $8,760.25 |
| 2/08/2023 | Chase Card | -$75.00 | $8,685.25 |
| **2/08/2023** | **Cash Withdrawal** | **-$8,000.00** | **$685.25** |
| 2/09/2025 | Zelle Payment from Stainley Shell | $600.00 | $1,285.25 |
| 2/13/2023 | Best Buy Card Payment | -$1,000.00 | $285.25 |
| 2/14/2023 | Huntington Bank Payment | -$1,057.18 | -$771.93 |
| 2/14/2023 | Well Fargo Card Payment | -$120.00 | -$891.93 |
| 2/15/2023 | Insufficient Funds Fee | -$34.00 | -$925.93 |
| 2/15/2023 | Insufficient Funds Fee | -$34.00 | -$959.93 |
| 2/17/2023 | Comenity Payment | -$522.85 | -$1,482.78 |
| 2/21/2023 | Insufficient Funds Fee | -$34.00 | -$1,516.78 |
| 2/23/2023 | Siriusxm | -$29.44 | -$1,546.22 |
| 2/24/2023 | Insufficient Funds Fee | -$34.00 | -$1,580.22 |

The evidence supports a finding that Pathan used $52,887.43 of the funds for the gas station business. Those transactions are in bold above. The remaining $47,112.57 was not used for the business.

Pathan testified that all the transactions listed above were for his business, except the DoorDash expense on January 30 and the two payments to Huntington Bank on January 30 and February 14 (which were payments on a personal car loan). The Court finds that Pathan's testimony on this point is not credible. For example, several of the transactions plainly could not have had a business purpose. On February 6, 2023, Pathan spent $94.10 at Sabri Nihari Restaurant in Chicago, Illinois, and on February 7, 2023, Pathan spent $150 with simplex.com, a website that appears to sell cryptocurrency. These do not appear to be legitimate business expenses for an owner of gas station convenience stores.

With the $42,000 cash withdrawal on January 27, 2025, Pathan purchased a cashier's check for $32,000 that he used to pay Holiday Wholesale, a company from which Pathan purchased products to sell in his convenience stores. This payment was corroborated by testimony from a Holiday Wholesale employee. Pathan had several unpaid invoices from Holiday Wholesale, and the $32,000 payment did not pay the entire balance he owed.

Pathan did not provide testimony regarding what he did with the remaining $10,000 in cash from the January 27 withdrawal. He said that he was so far behind on business expenses that he had to transact in cash for the business, but he did not say what he purchased for the business with the cash. Because Pathan's testimony

on this point was so vague and a bit cagey, the Court finds the testimony to be not credible and further finds that the remaining $10,000 withdrawn on January 27, 2023 was not used for a business purpose.

On January 30, 2023, Pathan spent $2,341.32 at Costco. He testified that he purchased groceries at Costco for the convenience stores. Given the size of the transaction, the nature of products sold at Costco, and the lack of evidence to the contrary, the Court finds that this expense was related to the business.

On January 30, 2023, Pathan paid $1,600.00 to Gourav Patel. Pathan testified that Patel was an employee of his business and the payment represented wages owed. Ahmed did not present evidence to contradict this testimony, so the Court finds that this expense was related to the business.

On January 31, Pathan wired $5,000 to Lincoln Fuel Inc. Lincoln Fuel is one of Pathan's gas station business entities. Ahmed did not present any evidence about what Lincoln Fuel did with the money, so the Court finds that the funds were used for business purposes.

On January 31 and February 6, 2023, Pathan sent payments via Zelle to "Stainley Shell." One of Pathan's gas station businesses is named Stanley Shell Inc. Neither party presented evidence as to whether the payments to "Stainley Shell" were to an account for the business called Stanley Shell; the Court therefore infers that the transfer was to a Stanley Shell account. Without further information regarding how the funds were spent once they were transferred to Stanely Shell, the Court finds that the funds were used for business purposes.

8

On February 2, 2023, Pathan wired funds to Paycycle, Inc. The transaction in the bank's records includes a reference to "Stanley Shell." (Pl. Ex. 9 at 12, Dkt. No. 33.) Paycycle appears to be a payroll provider. Neither party presented any evidence regarding this transaction. Given the reference to Stanley Shell and the absence of other information in the record, the Court finds that the transaction was for business purposes.

Pathan presented evidence that he made three cash payments to the business's creditors. On February 8, 2023, he paid $15,131.77 in cash to the Wisconsin Department of Revenue on behalf of Stanley Shell Inc. (Def. Ex. 4, Dkt. No. 35.) This lines up with a cash withdrawal he made on February 8, 2023 in the amount of $8,000. The Court therefore finds that the cash withdrawal on that date was used for business purposes. Pathan did not provide any information regarding where the rest of the cash for the payment came from. Pathan and Ahmed both testified that Pathan often used cash from the cash register to pay expenses, so it is likely that the remaining $7,131.77 came from there and not from one of the other cash withdrawals Pathan made from his account.

Pathan made a payment of $28,500 in cash on February 11, 2023 to Joe's Vending. (Def. Ex. 5, Dkt. No. 35.) Joe's Vending owns gaming machines placed in Pathan's convenience stores, such as video poker. The machines accept only cash and keep a log of receipts. Joe's Vending receives a percentage and the store keeps the remainder. Pathan, not Joe's Vending, collected the cash from the machines. It is unclear where the cash came from to pay Joe's Vending on February 11, and

Pathan didn't testify to it. The cash could have (and probably should have) come from the cash that Pathan collected from the machines, or it could have come from the cash register. There were no cash withdrawals from Pathan's bank account between February 8 and February 11, so the Court cannot find that the funds came from the loan proceeds.

On February 21, 2023 Pathan made a payment in the amount of $6,129.33 to Wisconsin Public Service Corporation ("WPS"), a utility provider for the gas stations. (Def. Ex. 6, Dkt. No. 35.) There are no cash withdrawals from Pathan's account that line up with that payment, so the Court cannot find that Pathan used the loan proceeds from Ahmed to make the payment.

The Court finds that the remaining withdrawals from Pathan's account were for personal expenses. Pathan made several payments to credit cards. He testified that they are all his personal cards, and his bankruptcy schedules included the accounts that Pathan paid. This is sufficient to establish that the payments were for Pathan's personal debt. Pathan says that his business and personal expenses were intertwined so the credit cards could have been used to pay both business and personal expenses. Pathan asserts that the payments to those cards should count as business expenses because at least some of the charges are related to the business. Pathan did not provide any specifics, however, and his testimony on this point was very vague. He did not submit the credit card statements or provide any concrete information about what business expenses were charged to the credit cards. The accounts clearly were in Pathan's name individually, and there is

10

nothing in the record aside from Pathan's vague, self-serving testimony to substantiate his claim that they were used for business expenses. The Court therefore finds that the various credit card payments were not made for the benefit of the business.

Pathan testified that the two $2,000 Zelle payments to Waqas Yaseen (or Yasin) were made because he borrowed money from Yaseen for his business. Pathan also testified that the payments made using Xoom, which appears to be an international digital payment platform, were to his cousin and brother-in-law to repay money he borrowed for the business. The Court finds Pathan's testimony regarding these payments to be not credible. Pathan provided no details regarding these purported loans. He didn't say when the loans were made, how much he borrowed, what he used the loans for (other than vague references to "the business"), or why he needed to repay the loans using the funds from Ahmed rather than using the funds to, for example, further pay down the Holiday Wholesale debt or purchase groceries for the convenience stores. In addition, during the § 341 meeting, the transcript of which was admitted into evidence, Pathan testified to receiving several payments from various family members to cover personal expenses. (Pl. Ex. 3 at 12-15, Dkt. No. 33.) In light of this history, and Pathan's inability to provide information about the supposed business loans from family members, the Court finds that the payments to family members were not business expenses.

Pathan agreed that the two payments to Huntington Bank on January 30 and February 14, 2023 were for a personal car loan, and he agreed that the Doordash transaction on January 30, 2023 was a personal expense.

Pathan did not testify regarding the remaining expenses, including an online payment to "Ala 3308," a payment labeled "Caf Direct Check Retry Pymt," a payment to Spectrum, a payment to WPS, a payment to Siriusxm, payments to two grocery stores in Chicago, Illinois, and a payment to a restaurant in Chicago, Illinois. All of these appear to be personal expenses. With respect to the payment to WPS, Pathan testified that he paid the business's WPS bill in cash on February 21, 2023. WPS also provides residential services, so the payment from his account on January 31, 2023 easily could have been for his personal residential utility service. Based on the Court's assessment of Pathan's credibility, the Court finds that all the remaining expenses were not for business purposes.

### 4. Ahmed's Collection Efforts

Meanwhile, Ahmed saw no improvement in the stores after he gave the loan to Pathan. He saw little change in store inventory, and customers still complained about the low stock. On February 24, 2023, Ahmed asked by text message where Pathan invested the money, and Pathan responded, "Just taking care of all the old stuff first." (Pl. Ex. 16 at 2, Dkt. No. 33.) By that time, Pathan had spent all of the money from Ahmed. A month later, Ahmed asked if Pathan invested the entire $100,000. Pathan responded, "Yes I did." (*Id.* at 7.) Ahmed then said, "Well then thats alarming if theres no improvement." (*Id.*) Pathan responded that it would take until the end of the year to turn the business around. (*Id.*)

The Notes seem to call for monthly payments of $1,100 on each, though the language is less than clear.  (Pl. Exs. 7 & 8, Dkt. No. 33.)  Pathan made a couple of payments, but they were always late.  By early 2024, the maturity date for one of the loans had passed, and Pathan had stopped making payments altogether. Ahmed began demanding repayment of both Notes.

In mid-May 2024, Pathan promised to repay Ahmed using funds he received from Oshkosh Fuel, LLC.  In a confusing episode, Ahmed apparently agreed to meet Pathan at a credit union where they would cash a check from Oshkosh Fuel in the amount of $100,000, and Pathan would use the funds to pay Ahmed.  (Pl. Ex. 13, Dkt. No. 33.)  According to Ahmed, the check turned out to be fake, and Pathan did not pay him.  A week later, Pathan wrote a check to Ahmed for $100,000.  (Pl. Ex. 14, Dkt. No. 33.)  Ahmed attempted to cash the check, but it was returned for insufficient funds.

Pathan filed a voluntary chapter 7 bankruptcy petition on June 6, 2024. (Case No. 24-23022, Dkt. No. 1.)  He listed a debt to Ahmed in the amount of $100,000 in his schedules.  (*Id.* at 39.)  Ahmed filed this adversary proceeding asking that the Court declare the debt owed to him to be excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and under 11 U.S.C. § 523(a)(6).  (Dkt. No. 1.)

After summary judgment, the case proceeded to trial based on Pathan's claim under 11 U.S.C. § 523(a)(2)(A).  Ahmed alleged that Pathan told him that the loan proceeds would be used for business expenses, that he relied on that statement in making the loan, and that Pathan did not use the loan funds for the business.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). *See* 84-1 Order of Reference (E.D. Wis. July 10, 1984) (available at https://www.wieb.uscourts.gov/general-orders) (last visited March 27, 2026). Determination of the dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I). To the extent the determination of dischargeability requires consideration of issues impacted by the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), the parties have consented to the bankruptcy court's final adjudication of these issues by their silence. *See* Fed. R. Bankr. P. 7008, 7012; *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683 (2015) ("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express."). This decision constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

## DISCUSSION

Ahmed objects to the discharge of the debt owed to him under 11 U.S.C. § 523(a)(2)(A), which excepts from discharge debts "obtained by . . . false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A). To have a debt declared nondischargeable under § 523(a)(2)(A), the creditor must show: (1) that the debtor made a false representation or omission, that he either knew was false or made with reckless disregard for the truth, (2) that the debtor had an intent to deceive or defraud, and (3) that the creditor justifiably relied on the

14

representation or omission. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011). The creditor must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). "[E]xceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992).

Ahmed presented sufficient evidence at trial to establish all elements under § 523(a)(2)(A) as to $47,112.57 of the $100,000 he lent to Pathan. The Court addresses each required element below.

### 1.    Underlying Debt

"[A] nondischargeability action under § 523(a) 'involves two separate elements: (1) liability for a debt, and (2) the dischargeability of that debt.'" *Cannon v. Johnson (In re Johnson)*, 661 B.R. 844, 851 (Bankr. W.D. Wis. 2024) (quoting *Burritt v. Hoven (In re Hoven)*, 652 B.R. 531, 538 (Bankr. W.D. Wis. 2023)). "Any debt established under non-bankruptcy law will suffice as long as it also meets the elements of an exception to discharge under § 523(a)." *Johnson*, 661 B.R. at 851 (noting that a creditor can establish an underlying debt "by proving, for example, a breach of contract involving the same transaction"); *see also Wolf v. McClure (In re McClure)*, 625 B.R. 733, 738-39 (Bankr. C.D. Ill. 2021) ("Even if such a creditor is unable to establish a debt for fraud under state law, she may yet hold a claim for a separate debt, provable by a preponderance of the evidence and arising out of the same transaction, that is itself actionable under § 523(a)(2)(A).").

Here, it is undisputed that Pathan owes a debt to Ahmed for breach of contract. Pathan's bankruptcy schedules include a $100,000 debt to Ahmed that is

15

not designated as contingent, unliquidated, or disputed.  (Case No. 24-23022, Dkt. No. 1, at 39.)  In addition, the evidence at trial included the two Notes.  Pathan does did not dispute that the Notes are valid, that Ahmed loaned him money pursuant to the Notes, or that Pathan was obligated to repay the Notes.  There was some evidence at trial that Pathan made one or more payments under the Notes, but the amount that he paid likely would not have covered the accruing interest.  Neither party suggested that Pathan owed any amount other than $100,000 to Ahmed on the petition date.  Therefore, there is an underlying debt in the amount of $100,000 for purposes of Ahmed's action for nondischargeability under § 523(a)(2)(A).

Ahmed's counsel suggested during closing argument that the underlying debt was for common law misrepresentation under Wisconsin law.  Ahmed's complaint does not mention a claim for misrepresentation, instead asking for a declaration "[d]etermining the two contracts to be non-dischargeable." (Dkt. No. 1 at 6.)  Ahmed also did not move to amend his complaint to conform to the evidence pursuant to Rule 15.  *See* Fed. R. Bankr. P. 7015.  The undisputed contract debt suffices to establish the underlying debt, so the Court does not reach the question whether Ahmed might also have a claim against Pathan for common law misrepresentation.

### 2.    False Representation with Knowledge

"[A] false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct." *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 471 (Bankr. N.D. Ill. 2011).  "[A] false representation must ordinarily relate to a present or past fact." *Groom v. Krook (In*

16

*re Krook)*, 615 B.R. 479, 485 (Bankr. N.D. Ill. 2020) (quotation omitted). "But a false promise will be actionable and so will support a section 523(a)(2)(A) claim if the debtor made the promise with no intention of keeping it." *Id.* (citing *Holtz v. JPMorgan Chase Bank, N.A.*, 846 F.3d 928, 932 (7th Cir. 2017) ("[M]aking a promise with intent not to keep it is fraud.")). Thus, "when a creditor entrusts the debtor with money to use for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held non-dischargeable." *In re Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995). *See also Merchants Nat'l Bank & Trust Co. v. Pappas (In re Pappas)*, 661 F.2d 82, 86 (7th Cir. 1981) ("[W]here the bankrupt is entrusted with money to be used for a specific purpose, and he has no apparent intention of using the money for that purpose, then a misrepresentation clearly exists upon which a debt can be properly held non-dischargeable.").

Additionally, an omission or a failure to correct a false impression can be a false representation for purposes of § 523(a)(2)(A). "[O]missions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Memorial Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 928 (Bankr. N.D. Ill. 1996); *see also Benton*, 540 B.R. at 377 ("Thus, silence or concealment may constitute false pretenses."); *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 157 (Bankr. N.D. Ill. 2009) ("A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply

a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression.").  Such circumstances exist "when a debtor, with the intent to mislead a creditor, engages in 'a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or understanding of a transaction, in which the creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.'"  *Illinois Dep't of Emp. Sec., (In re Davis)*, 668 B.R. 580, 599 (Bankr. N.D. Ill. 2025) (quoting *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996)) (cleaned up).

Here, Ahmed credibly testified as to the circumstances surrounding the loan. Pathan told or suggested to Ahmed that he would use the loan for business purposes.  Pathan repeatedly told Ahmed that he needed money to stock the shelves of the convenience stores, and that he needed cash to invest in the business. Pathan denies any discussions regarding the purpose of the loan, but Pathan's testimony was not as credible as Ahmed's.

The weight of the evidence presented at trial supports a conclusion that Pathan made an affirmative representation to Ahmed that he would use the loan proceeds for business purposes.  The record also supports a conclusion that Pathan knowingly created a misimpression about his use of the loan proceeds.  Even if Pathan did not utter the words, "I will use the loan proceeds for business purposes," he can still be liable if he knowingly left Ahmed with the false impression that he would use the loan for the business.  According to Ahmed, the parties had many

18

discussions about Pathan's need for money to stock the shelves and otherwise pay business expenses. Pathan therefore knew that Ahmed believed Pathan would use the money for the business. This false impression is supported by the parties' text messages in the months after the loan when Ahmed asked whether all the money had been invested in the business. (*See* Pl. Ex. 16, Dkt. No. 33.) Pathan's response was not to correct Ahmed or tell him it hadn't been invested in the business; Pathan instead assured Ahmed that the money had, in fact, been invested. This was false.

### 3.      Intent to Deceive

A debtor's knowledge of a false representation or false pretense is not enough under § 523(a)(2)(A); the debtor also must intend to *deceive*, meaning that he must intend to induce the creditor to rely on the false representation or omission to his detriment. *See Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010). Deception is proven by demonstrating that a debtor intentionally induced the creditor to act based on the false representation. *See Whitcomb v. Smith*, 572 B.R. 1, 15 (B.A.P. 1st Cir. 2017) (creditor must prove, among other elements, that "the debtor intended to induce the creditor to rely upon the false statement" (quotation omitted)); *Holton v. Zaidel (In re Zaidel)*, 553 B.R. 655, 663 (Bankr. E.D. Wis. 2016) ("An intent to deceive may be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor." (citing *Sarama*, 192 B.R. at 927)).

"Proof of intent for purposes of § 523(a)(2)(A) must be measured by a debtor's subjective intention at the time of the transaction in which the debtor obtained the money, property or services." *Mega Marts, Inc. v. Trevisan (In re Trevisan)*, 300

B.R. 708, 717 (Bankr. E.D. Wis. 2003).  Direct proof of a debtor's subjective intent is not required, and a court may infer that the debtor acted with intent to deceive based on the circumstances surrounding the debtor's misrepresentation.  *Sheridan*, 57 F.3d at 633; *see also Cent. Credit Union of Ill. v. Logan* (*In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part" (quotation omitted)).  Where (as here) a creditor entrusts the debtor with money to use for a specific purpose and the debtor has no intention of using it in that manner, "proof that the debtor never put the money toward the stated purpose allows a court to infer the requisite intent." *Sheridan*, 57 F.3d at 635.

Pathan knew before he deposited the checks from Ahmed that he would not be using all the loan proceeds for business purposes.  On January 26, 2023 when Pathan deposited the checks, the balance in his account was negative $1,793.00. (Pl. Ex. 9 at 2, Dkt. No. 33.)  The balance had been negative for over a week at that point.  Yet Pathan never informed Ahmed that some of the loan would be used to cover his own overspending.  This evidence strongly suggests an intent to deceive Ahmed.

As soon as Pathan deposited the loan proceeds in his account, he set to work spending the money.  One of the first transactions was to make a payment to Holiday Wholesale, an important vendor, but Pathan immediately made thousands in payments to family, friends, and personal credit cards.  Pathan also withdrew

$20,000 in cash ($10,000 of the $42,000 January 27, 2023 cash withdrawal and $10,000 on January 30, 2023) within four days after receiving the loan without any explanation as to how he spent the cash except to say, vaguely, that he spent it on the business.

Within three weeks Pathan had spent the entirety of the loan proceeds, including on transactions that were admittedly for personal expenses. The fact that Pathan so immediately spent the money on expenses that could not and would not have supported stocking the shelves or paying expenses needed for the business to maintain or improve operations suggests that Pathan never intended to spend all the money on such expenses.

The timing and nature of Pathan's use of the loan proceeds supports the inference that, at the time he represented to Ahmed that he would use the loan proceeds for business purposes, he already intended to break that promise. Considering this timing alongside the totality of the circumstances based on the evidence presented at trial, the Court finds that Pathan had the intent to deceive Ahmed.

### 4. Reliance

Ahmed established that he justifiably relied on Pathan's misrepresentation as to how he would use the loan proceeds. Justifiable reliance is subjective and requires examination of "the circumstances of a particular case and the characteristics of a particular plaintiff." *Ojeda*, 599 F.3d at 717. "Justifiable reliance is a less demanding standard than reasonable reliance; it requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which

21

would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Id.* (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)). "A victim who lacks access to the truth, and has not been alerted to facts that would alert him to the truth, is not to be . . . blocked by a discharge under the bankruptcy laws . . . just because he did not conduct a more thorough investigation." *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995). In assessing a creditor's reliance, a court may consider, among other things, the existence of a relationship of trust between the parties. *See SLK Cap. LLC v. Beach (In re Beach)*, 651 B.R. 359, 375-76 (Bankr. E.D. Wis. 2023).

Ahmed credibly testified that he relied on Pathan's representations about how he would use the borrowed money, and that he would not have made the loan to Pathan if he had known that Pathan would use the money for personal expenses. This is because Ahmed expected that the loan would be repaid with the business's profits, which he believed would increase if Pathan could stock the stores. Pathan did not present any evidence to contradict Ahmed's testimony. The evidence suggests that Pathan took advantage of the parties' relationship to convince Ahmed to lend him money for the business, and that Ahmed justifiably relied on Pathan's statements regarding his intended use of the loan proceeds.

### 5.    Damages

The Court can declare a debt to be nondischargeable only "to the extent [the money was] obtained by . . . false pretenses, a false representation, or actual fraud[.]" 11 U.S.C. § 523(a)(2)(A). This means that "[n]ondischargeability therefore is limited to that portion of the debt directly attributable to fraudulent acts."

*Baytree Nat'l Bank v. Christensen (In re Christensen)*, Adv. No. 04 A 3646, 2005 WL 1941231, at \*5 (Bankr. N.D. Ill. Aug. 12, 2005); *see also Ojeda*, 599 F.3d at 720 ("Because the statute provides that an extension is non-dischargeable 'to the extent' that it is obtained by a false representation, the question for us is what portion of the forbearance is directly attributable to the false representation." (citing *Christensen* with approval)); *Republic Bank of Chicago v. Poulos (In re Poulos)*, 636 B.R. 535, 541 (Bankr. N.D. Ill. 2022) ("[I]f the debtor misapplies only a portion of a loan, the amount of the loan not used in the required manner is nondischargeable.").

Ahmed's counsel conceded at trial that Ahmed is not entitled to a declaration of nondischargeability with respect to amounts that Pathan used for business purposes.  Pathan used $52,887.43 of the loan proceeds from Ahmed for his convenience store business.  The remaining $47,112.57 was not used for the business.  Therefore, the Court will declare that $47,112.57 of the underlying debt is not dischargeable.

Ahmed requests that the Court enter a money judgment in his favor.  (*See* Compl. at 6, Dkt. No. 1.)  When an underlying debt has not been reduced to judgment prepetition, a bankruptcy court can enter a money judgment against the debtor in the amount determined to be nondischargeable under section 523 as long as the parties have consented to the bankruptcy court's entry of a final judgment. *Siragusa v. Collazo (In re Collazo)*, 817 F.3d 1047, 1053-54 (7th Cir. 2016).  The parties have consented by their silence.  *See Wellness*, 575 U.S. at 681-82; Fed. R.

Bankr. P. 7008, 7012; Bankr. E.D. Wis. L.R. 7008, 7012 (2024). Therefore, the Court will order that a money judgment be entered in favor of Ahmed in the amount of $47,112.57.

During closing argument, Ahmed's counsel also asked the Court to award attorney's fees and prejudgment interest. Counsel could not articulate a basis for an award of attorney's fees or a rate of prejudgment interest, and he requested the ability to brief those issues. The Court will enter a separate scheduling order with respect to that briefing.

**CONCLUSION**

Ahmed presented sufficient evidence to prove that he loaned $100,000 to Pathan under false pretenses because Pathan falsely suggested that he would use all the loan proceeds for business purposes. Of the $100,000 loan, Pathan used only $47,112.57 for personal expenses. The Court will grant Ahmed's request for a declaration of nondischargeability as to that portion of the debt. The Court will enter a separate order consistent with this decision.

Dated: March 27, 2026

Rachel M. Blise
U.S. Bankruptcy Judge